## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____
                                          )
M NICOLAS ENTERPRISES, LLC,               )
d/b/a WORLD WIDE HEALTH SERVICES,         )
and MICHELLE NICOLAS, individually,       )
                                          )
                 Plaintiffs,              )
                                          )
        v.                                )        No. 20-cv-691C
                                          )
THE UNITED STATES,                        )        Filed: September 1, 2021
                                          )
                 Defendant.               )
_____)

## OPINION AND ORDER

Plaintiffs M Nicolas Enterprises, doing business as World Wide Health Services ("WWHS"), and Michelle Nicolas bring this action seeking relief under the Tucker Act, 28 U.S.C. §§ 1491(a)(1) and (b)(1) (2011); the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2011); and the Contract Disputes Act ("CDA"), 41 U.S.C. § 7101 *et. seq.* (1966), for alleged violations of law in connection with a U.S. Department of Veterans Affairs ("VA") solicitation to procure adult day care services. The Government moved to dismiss Plaintiffs' claims, with the exception of WWHS's § 1491(b)(1) bid protest claim, for lack of jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). For the reasons that follow, the Government's partial motion to dismiss is **GRANTED**. The Court lacks jurisdiction as to each claim except WWHS's § 1491(b)(1) claim.

### I.  BACKGROUND

#### A.    Factual History

Ms. Nicolas is the sole owner and President of WWHS, which operates as an adult day care facility in West Palm Beach, Florida. Pls.' Am. Compl. Pursuant to R. 3.1 ¶¶ 4–5, 12, ECF No.

57.  On January 29, 2018, Ms. Nicolas, acting through and on behalf of WWHS, submitted a proposal to VA Network Contracting Office 8 ("NCO 8") in response to a VA solicitation ("Solicitation") seeking to procure adult day care services for veterans at community facilities under indefinite delivery contracts.  *Id.* ¶¶ 10(c), 13–14.  The Solicitation anticipated multiple awards.  *Id.* ¶ 13.

As the first step in considering WWHS for a contract award, the VA inspected WWHS's facility in March 2018.  *Id.* ¶ 17.  Plaintiffs allege that the VA employee conducting the inspection informed Ms. Nicolas of only a few minor items that needed correction but otherwise stated that, once corrected, he would not need to return to the facility.  *Id.* ¶ 18.  He allegedly mentioned, however, that he wanted to get more information about whether the facility needed additional fire equipment.  *Id.*

About a week later, Ms. Nicolas received an email from VA employee Charlene Crace, attaching a copy of the inspection report.  *Id.* ¶ 19.  Ms. Crace allegedly stated that the initial inspection had identified ten deficiencies and told Ms. Nicolas that she had until April 21, 2018, to submit a corrective action plan to the VA's West Palm Beach Community Program Office.  *Id.* ¶¶ 19, 21.  As relevant here, the most substantial deficiency identified in the report was the need for a fire alarm system with "manual means of activation as well as smoke detection," *id.* ¶ 21, despite the fact that WWHS had an existing fire alarm system, *id.* ¶ 23.  Plaintiffs claim the inspection report contained several inaccuracies regarding WWHS's facility, *id.* ¶ 20, but it nonetheless stated that WWHS was "recommended for placement pending corrective action" of the listed deficiencies, *id.* ¶ 22 (emphasis omitted).

Plaintiffs allege that Ms. Nicolas promptly cured all the deficiencies, with the exception of the fire alarm system, and sent Ms. Crace documentation that the deficiencies had been fully

addressed. *Id.* ¶¶ 21, 23.  Ms. Nicolas's email also sought clarification regarding the fire alarm requirement, which she believed unnecessary and contrary to the applicable life safety code in effect at the time. *See id.* ¶ 22 n.4.  The next day—several weeks before the deadline to correct deficiencies—Ms. Crace allegedly notified Ms. Nicolas via email that the VA would not be moving forward with WWHS's proposal for reasons that Plaintiffs claim contradict the realities of WWHS's facility.[1] *Id.* ¶ 24.

Frustrated, Plaintiffs claim that Ms. Nicolas emailed her communications with Ms. Crace to Rodney Cassidy, the VA Administrative Contracting Officer in Tampa and the named contact for the Solicitation. *Id.* ¶ 27.  According to Plaintiffs, Mr. Cassidy told Ms. Nicolas that Ms. Crace's denial was sent erroneously, and Ms. Nicolas should disregard it. *Id.*  When a letter from Ms. Crace confirming the denial arrived soon after, Plaintiffs claim Ms. Nicolas again contacted Mr. Cassidy, who again told her to disregard the denial. *Id.* ¶ 28.  In an email received on April 3, 2018, Mr. Cassidy allegedly told Ms. Nicolas to "go ahead and put in the smoke detection (smoke alarms)" and assured her that he "d[id] not foresee . . . any problems when you have your reinspection." *Id.* ¶ 29.

Several weeks later, Ms. Nicolas allegedly sent a copy of the contract for the installation of a fire alarm system costing $10,000 to the VA's West Palm Beach office, as well as to Mr. Cassidy. *Id.* ¶¶ 31–32.  Once the fire alarm system was fully installed, Ms. Nicolas allegedly sent documentation to the VA confirming its installation. *Id.* ¶ 34.  Plaintiffs claim Ms. Nicolas then received an email from Mr. Cassidy confirming "that your fire inspection plan 3-15-2018 has been satisfied" and indicating that the VA would be conducting a second inspection. *Id.*

---

[1] Plaintiffs' Amended Complaint does not specify the reason(s) provided in Ms. Crace's email.

After the second inspection in July 2018, Ms. Nicolas allegedly contacted Mr. Cassidy for an update and raised concerns about the lack of communication regarding the status of WWHS's proposal. *Id.* ¶¶ 35–36. Mr. Cassidy allegedly informed Ms. Nicolas, who is African American, that it "may be the color of your skin" that was causing the difficulty. *Id.* ¶ 36.

On August 8, 2018, Ms. Nicolas received, via email from Mr. Cassidy, a letter from VA Contracting Officer Yamil Rodriguez stating that the VA was not recommending WWHS for approval of the solicitation contract. *Id.* ¶ 37. Plaintiffs allege the letter contained a list of the same deficiencies Ms. Nicolas purportedly corrected, as well as a series of new ones. *Id.* In response to a subsequent email from Ms. Nicolas, Ms. Rodriguez allegedly stated that the denial was based on the second inspection and that WWHS had "more than a fair opportunity" in the bidding process considering that it had two inspections, despite the terms of the Solicitation only requiring one. *Id.* ¶ 38.

Unsatisfied with Ms. Rodriguez's response, Plaintiffs allege that Ms. Nicolas elevated WWHS's case to the Division Chief of NCO 8. *Id.* ¶ 39. He allegedly informed Ms. Nicolas that the Solicitation omitted VA Handbook 1147.1 (the "Handbook"), which he attached to the email.[2] *Id.* ¶ 40. According to Plaintiffs, this document appeared to be a draft and not an official government handbook. *Id.* Moreover, they allege it is not the handbook specifically referenced in the Solicitation. *Id.* ¶ 41 n.8 (citing Handbook 1141.03, "Adult Day Health Care"). On August 29, 2018, the Division Chief allegedly sent a follow up email providing a cursory explanation of the basis for denying WWHS's proposal, which Plaintiffs allege contained several inaccuracies. *Id.* ¶ 43.

From there, Ms. Nicolas was put in contact with the Deputy Director of Contracting for

---

[2] Plaintiffs do not attach a copy of the Handbook to the Amended Complaint.

NCO 8. *Id*. ¶ 44. Per his request, Ms. Nicolas allegedly sent a list of five "questions she wanted answers to" regarding her concerns of bias and discrimination in the solicitation process. *Id*. ¶ 44(1)-(2). On September 11, 2018, the Division Chief responded by email, allegedly stating that: (1) despite being unable to verify the accuracy of the copy provided, the Handbook was nonetheless current; (2) he could not detect any bias or prejudice in the evaluation of WWHS's proposal, (3) WWHS did in fact receive a fair opportunity to apply for a solicitation contract, and (4) no further action would be taken on WWHS's proposal. *Id*. ¶ 45(a)-(d). The Division Chief further stated that any remedies to resolve concerns about "direction given to members of [WWHS]" during the solicitation process should be addressed in accordance with Part 33 of the Federal Acquisition Regulations ("FAR") or through other legal remedies. *Id*. ¶ 45(e).

Plaintiffs claim that Ms. Nicolas thereafter contacted the Executive Director of the VHA Regional Procurement Office East, who allegedly stated that an independent team had conducted a review and determined errors existed in the September 11 response. *Id*. ¶ 47. Plaintiffs claim that the Executive Director apologized for not properly handling WWHS's proposal. *Id*. Despite allegedly assuring Ms. Nicolas that a new solicitation would be issuing in October 2018, none had issued as of the date Plaintiffs filed their complaint. *Id*.

## B.   Procedural History

Plaintiffs first filed their Complaint (ECF No. 1) in the United States District Court for the Southern District of Florida on May 13, 2019, followed by an Amended Complaint (ECF No. 35) filed in January 2020. After the Government moved to dismiss the Amended Complaint for lack of jurisdiction, the district court entered an order in April 2020 transferring the case to the Court of Federal Claims. *See* Order Transferring Venue, ECF No. 40.

On August 21, 2020, Plaintiffs filed in this Court an Amended Complaint Pursuant to

RCFC 3.1, alleging that in considering WWHS's proposal the VA violated the terms of the Solicitation; unlawfully imposed terms in excess of the Solicitation, giving rise to a breach of an implied-in-fact contract; discriminated against Plaintiffs in violation of the Fifth Amendment's right to due process and equal protection; and arbitrarily and capriciously denied Plaintiffs an award under the Solicitation. *See generally* ECF No. 57. Plaintiffs assert their claims under Tucker Act §§ 1491(a)(1) and (b)(1), APA § 706, and the CDA. *See id.*

On September 25, 2020, the Government moved to dismiss under RCFC 12(b)(1) for lack of subject matter jurisdiction. *See* Def.'s Sealed Mot. to Dismiss, ECF No. 68 (redacted version). According to the Government, Plaintiffs' § 1491(a)(1) claims should be dismissed because bid protest claims arising in the procurement context must be brought exclusively under § 1491(b)(1). *Id.* at 6–8. Furthermore, it argues that the APA and Fifth Amendment claims are beyond the Court's jurisdiction, since neither source of law is money-mandating under the Tucker Act. *Id.* at 8. As to Plaintiffs' CDA claims, the Government argues that Plaintiffs failed to comply with the CDA's prerequisites, namely they failed to submit a written claim to the contracting officer and never received her final decision on that claim. *Id.* at 9–10. Finally, the Government contends that Ms. Nicolas lacks standing to bring any claims individually. *Id.* at 10. As the Government sees it, only WWHS's § 1491(b)(1) bid protest claim can survive dismissal. *Id.* at 1, 10.

Plaintiffs disagree. As to their § 1491(a)(1) claims, they argue that by requiring WWHS to install a duplicate fire alarm system—based on a handbook that was outside the specifications of the Solicitation—the Government entered into an implied-in-fact contract with Plaintiffs, which is distinct from their § 1491(b)(1) claim. Pls.' Mem. in Opp'n to Def.'s Mot. to Dismiss at 4–6, ECF No. 67. They also raise a new argument, claiming that the Government's addition of requirements outside the terms of the Solicitation resulted in an illegal exaction. *Id.* Additionally,

they state that their Count II APA and Fifth Amendment claims are "substantive elaborations or applications of the jurisdictional claims of § 1491(b)(1), as incorporated through § 1491(b)(4), or those not otherwise covered by the claims and issues under Count I under § 1491(a)(1)." *Id.* at 11. Finally, Plaintiffs contend that they met the CDA prerequisites, albeit without the degree of formalism the Government argues is necessary. *Id.* at 15.  Plaintiffs further argue that Ms. Nicolas is a real party of interest vis-à-vis the § 1491(a)(1) claims because she personally incurred costs on behalf of WWHS and "it is through [Ms. Nicolas] that her entity acquired a racial identity" resulting in the alleged discrimination. *Id.*  As the sole owner of WWHS, Plaintiffs assert she also has third party standing as to both the §§ 1491(a)(1) and (b)(1) claims. *Id.* at 16.

## II.  LEGAL STANDARDS

### A.     Jurisdiction of the Court of Federal Claims

Establishing the Court's subject matter jurisdiction is an "inflexible" threshold matter. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).  The Court may inquire into jurisdiction even if a defendant does not raise a jurisdictional objection.  The jurisdiction of the Court "cannot be conferred by waiver or acquiescence." *Coastal Corp. v. United States*, 713 F.2d 728, 730 (Fed. Cir. 1983).  Should the Court determine that jurisdiction is lacking, it must dismiss a plaintiff's complaint. *See* RCFC 12(b)(1), (h)(3).

Under the Tucker Act, the Court of Federal Claims may hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).  The Act, however, "does not create any substantive right" for money damages against the United States. *United States v. Testan*, 424 U.S. 392, 398 (1976).  To establish the Court's jurisdiction under § 1491(a)(1), a plaintiff must identify a source of substantive law

mandating the payment of money damages. *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). The Court also has jurisdiction under the Tucker Act over actions by interested parties "objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

Under the CDA, the Court has jurisdiction over a contractor's appeal from a decision by a contracting officer relating to a contract for the procurement of services. 41 U.S.C. §§ 7102(a)(2), 7104(b); *see* 28 U.S.C. § 1491(a)(2). CDA jurisdiction "requires both that a claim meeting certain requirements [has] been submitted to the relevant contracting officer and that the contracting officer [has] issued a final decision on that claim." *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015); *see* 41 U.S.C. §§ 7103, 7104(b).

## B.    Standard of Review

The burden of establishing jurisdiction by a preponderance of the evidence falls upon the plaintiff. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); *see Kemp v. United States*, 65 Fed. Cl. 818, 820 (2005). In deciding a motion to dismiss pursuant to RCFC 12(b)(1), "the court assumes that all well-pleaded facts alleged in the complaint are true and draws all reasonable inferences in favor of plaintiff." *Kemp*, 65 Fed. Cl. at 820 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984)). If jurisdictional facts are disputed, the plaintiff may not rest on mere allegations; instead, it must produce competent proof sufficient to support its allegations. *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936); *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002). The Court is free in such case to "look beyond the pleadings and 'inquire into jurisdictional facts' to determine whether jurisdiction exists." *K-Lak Corp. v. United States*, 93 Fed. Cl. 749,

752 (2010) (quoting *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)).

## III.  DISCUSSION

Other than WWHS's § 1491(b)(1) bid protest claim, Plaintiffs' claims must be dismissed pursuant to RCFC 12(b)(1) because the allegations in the Amended Complaint do not establish subject matter jurisdiction.  Plaintiffs likewise fail to demonstrate that Ms. Nicolas has standing to pursue claims individually.

### A.     The Court Lacks Jurisdiction to Hear Plaintiffs' § 1491(a)(1) Claims.

#### 1.     The Allegations Asserted in Count I Are Bid Protest Claims.

Count I of the Amended Complaint alleges claims under both §§ 1491(a)(1) and (b)(1) related to the VA's consideration and denial of WWHS's proposal.  The Government contends that Plaintiffs' allegations, properly construed, assert only a bid protest claim related to the VA's procurement of services, and thus the Court's jurisdiction is limited exclusively to § 1491(b)(1). ECF No. 68 at 7; Def.'s Reply to Pls.' Opp'n to Mot. to Dismiss at 2–3, ECF No. 73 (redacted version).  The Court agrees.

What the Amended Complaint categorizes as § 1491(a)(1) claims more aptly allege a bid protest challenging the VA's solicitation process and decision not to award Plaintiffs a contract. *See e.g.*, ECF No. 57 ¶ 49 (alleging that the VA violated the express terms of the Solicitation, imposed additional terms in excess of the Solicitation, unlawfully denied award of the Solicitation, and discriminated against Plaintiffs in the solicitation process).  There is also no dispute that the solicitation at issue relates to an Executive agency's procurement of services.  ECF No. 68 at 7; ECF No. 57 ¶ 13; *see Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (defining procurement under § 1491(b)(1) to include "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services

and ending with contract completion and closeout" (emphasis omitted) (quoting 41 U.S.C. § 403(2) (2011)).

The Federal Circuit determined in *Resource Conservation Group, LLC v. United States*, 597 F.3d 1238 (Fed. Cir. 2010), and more recently in *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326 (Fed. Cir. 2021), that this Court's jurisdiction over a bid protest claim in the procurement context arises "under § 1491(b)(1), and only § 1491(b)(1)." *Safeguard Base Operations*, 989 F.3d at 1342; *see Res. Conservation Grp.*, 597 F.3d at 1246. In *Reservation Conservation Group*, the Federal Circuit addressed the effect of the Administrative Dispute Resolution Act of 1996 ("ADRA") on the Court of Federal Claims' jurisdiction over bid protest claims under § 1491(a)(1). *See Res. Conservation Grp.*, 597 F.3d at 1245–46. As the Court explained, prior to the enactment of ADRA, the Court of Federal Claims exercised jurisdiction under § 1491(a)(1) over "suits by disappointed bidders challenging contract awards based on alleged improprieties in the procurements process" under an implied contract theory that the Government would fairly and honestly consider proposals for government contracts. *See id.* at 1242. To eliminate problems that arose after the decision in *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970), which held that federal district courts can review agency procurement decisions under the APA, ADRA expanded the Court of Federal Claims' jurisdiction by authorizing it under § 1491(b)(1) to entertain the "full range of procurement protest cases." *Res. Conservation Grp.*, 597 F.3d at 1243 (quoting H.R. Rep. No. 104-841, at 10 (1996)). While holding that the pre-existing implied-in-fact-contract jurisdiction under § 1491(a)(1) survived ADRA in non-procurement bid protests, *Reservation Conservation Group* determined that § 1491(b)(1)'s jurisdiction is "exclusive where [§] 1491(b)(1) provide[s] a remedy (in procurement cases)." *Id.* at 1246.

Following the conclusion of briefing in this case, *Safeguard Base Operations* addressed the enduring ambiguity of whether the same implied-in-fact contract jurisdiction survived in the procurement context, and if so, whether jurisdiction fell under §§ 1491(a)(1) or (b)(1).  989 F.3d at 1341–42.  Answering this question, the Federal Circuit held that, in a procurement action, the Court of Federal Claims has jurisdiction over a claim that the Government breached an implied-in-fact contract to fairly and honestly consider a bidder's proposal "under § 1491(b)(1), and only § 1491(b)(1)."  *Id.* at 1342.  Central to the Federal Circuit's holding was Congress's intent "[not] to limit the Claims Court's jurisdiction over any type of procurement bid protest" but "to consolidate jurisdiction over all such matters in the Claims Court."  *Id.* (explaining that Congress intended for the APA standard of review to apply "to *all procurement protest cases* in the Court of Federal Claims." (emphasis added) (quoting H.R. Rep. No. 104-841, at 10)); *see also Res. Conservation Grp.*, 597 F.3d at 1246 ("The legislative history makes clear that the ADRA was meant to unify bid protest law in one court under one standard.").

Accordingly, the only claim in Count I that can survive dismissal is the bid protest under the Court's § 1491(b)(1) jurisdiction.

2.    Assuming the Allegations Are Construed as Separate § 1491(a)(1) Claims, Plaintiffs Have Not Demonstrated Jurisdiction.

Plaintiffs' Opposition does not take issue with the Federal Circuit's precedent or the legislative history of ADRA but rather argues that nothing prohibits the Court from exercising concurrent jurisdiction under both §§ 1491(a)(1) and (b)(1).  ECF No. 67 at 10.  They contend that the VA's imposition of the fire alarm requirement exceeded the terms of the Solicitation, and thus gave rise to separate implied-in-fact contract and constitutional claims under § 1491(a)(1).  ECF No. 57 ¶ 49(b), (d)–(f); ECF No. 67 at 4.  In their brief, Plaintiffs allege for the first time that such allegations support an illegal exaction claim, as well.  ECF No. 67 at 4–6.  As discussed above, it

would be a stretch to construe Plaintiffs' § 1491(a)(1) claims as distinct from their § 1491(b)(1) bid protest claim; but even assuming they were, Plaintiffs have failed to demonstrate that the Court would have jurisdiction to entertain them.

a.      *Implied-In-Fact Contract Claim*

Plaintiffs allege a breach of an implied-in-fact contract with the VA based on: (1) the VA's alleged assertion that WWHS would move forward with the Solicitation if it installed a duplicative fire alarm system in its facility, (2) Plaintiffs' reliance to their detriment on the VA's representations by incurring costs to install the new system, and (3) the VA's decision not to award WWHS a contract under the Solicitation despite compliance with the fire alarm requirement.  ECF No. 57 ¶ 49(b); *see* ECF No. 67 at 4.  Plaintiffs specifically allege in Count I that imposing such requirement was unlawful because it was unauthorized by (and exceeded the terms of) the Solicitation.  *Id.*  The Government contends in its Reply that the CDA applies to Plaintiffs' contract claim, and thus "provides the 'exclusive' remedy for breach."[3]  ECF No. 73 at 3 (quoting *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995)).  The Court will address its CDA jurisdiction below, but as an initial matter, Plaintiffs' implied-in-fact contract claim fails for a more fundamental reason: it fails to plead all the elements of such claim.

To demonstrate jurisdiction under § 1491(a)(1), Plaintiffs must assert a "well pleaded allegation" of a breach of implied-in-fact contract.  *Bank of Guam v. United States*, 578 F.3d 1318, 1325 (Fed. Cir. 2009).  The Federal Circuit has "held that jurisdiction under this provision requires no more than a non-frivolous *allegation* of a contract with the government."  *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011) (emphasis in original) (citing *Lewis v. United*

---

[3] If the CDA does apply to Plaintiffs' breach of contract claim, then the CDA—not § 1491(a)(1)—would be the exclusive remedy.  *Dalton*, 50 F.3d at 1017.

*States,* 70 F.3d 597, 602, 604 (Fed. Cir. 1995)).  Whether a contract actually existed—*i.e.*, whether a plaintiff has established all the elements necessary to the formation of a valid contract—is not a jurisdictional question.  *See id.* at 1354–55.  Nonetheless, the jurisdictional inquiry "'starts with the complaint, which must . . . state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed.'"  *Perry v. United States*, 149 Fed. Cl. 1, 17 (2020) (quoting *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997), *aff'd*, 2021 WL 2935075 (Fed. Cir. July 13, 2021)).  Accordingly, to show jurisdiction, a plaintiff must at least plead the elements of a contract: "(1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance; and (4) actual authority on the part of the government's representative to bind the government."  *Marchena v. United States*, 128 Fed. Cl. 326, 331 (2016) (citation omitted).

Here, Plaintiffs' allegations with respect to the fourth element (authority) are fatal to their contract claim.  Not only do Plaintiffs fail to allege that the VA employees upon whose alleged representations they relied had actual authority to bind the Government, they expressly aver they did not.  Specifically, Plaintiffs allege that conditioning WWHS's ability to move forward in the solicitation process on the requirement that it install a new fire alarm system was "unauthorized by the solicitation" and "in excess" of the Solicitation's terms.  ECF No. 57 ¶ 49(b); ECF No. 67 at 4.  Indeed, in pleading the same implied-in-fact contract as the basis of the CDA claim in Count III, Plaintiffs specifically allege that it constituted an "unauthorized commitment."  ECF No. 57 ¶ 66.  They do not allege that such commitment was ratified by the VA, either on the individual or agency level.  Rather, Plaintiffs claim that the VA's failure to award WWHS a contract under the Solicitation after it satisfied the fire alarm requirement "necessitate[s] the ratification of an unauthorized commitment pursuant to 48 C.F.R. [§] 801.602-3."  *Id.* ¶ 69.  That VA regulation merely sets forth the procedures for a contracting officer to request ratification from an appropriate

VA approving authority.  48 C.F.R. § 801.602-3 (2008).  It does not require ratification in any circumstance, nor does it purport to create any right or benefit enforceable at law by a party in a civil action.

Assuming the truth of Plaintiffs' allegations, as the Court must at this stage, Plaintiffs have pled themselves out of court with respect to an implied-in-fact contract claim through allegations that negate at least one element of their claim.

### b.    Illegal Exaction Claim

In their Opposition, Plaintiffs raise—for the first time—an alternative argument that (if not an implied-in-fact contract) the imposition of the fire alarm requirement resulted in an illegal exaction.  ECF No. 67 at 4–5.  Specifically, Plaintiffs argue that the VA used the Handbook to impose an unlawful requirement that "resulted in the payment of money . . . to better the governments [sic] deal beyond the terms of the solicitation."  *Id.* at 5.  Despite arguing that such claim is "plain in the facts of the pleading," *id.* at 4, the Amended Complaint contains no articulation of an illegal exaction claim, as the Government notes, *see* ECF No. 73 at 3.  It is well established that a plaintiff may not amend its pleading by raising claims for the first time in responsive briefing.  *See Perry*, 149 Fed. Cl. at 17 n.11 (collecting cases).  Plaintiffs' illegal exaction claim is, therefore, not properly before the Court.

Even were this not the case, Plaintiffs have not adequately pled an illegal exaction claim sufficient to invoke the Court's jurisdiction.  To do so, Plaintiffs' Amended Complaint would need to contain, at a minimum, "the requisite *factual* allegations necessary to support such a claim."  *Id.* at 33; *see Perry*, 2021 WL 2935075, at *3 (agreeing that trial court lacked jurisdiction over the plaintiff's illegal exaction claim where he failed to plead the relevant factual assertions).  An illegal exaction may be brought where "(1) money was taken [from the plaintiff] by the government and

(2) the exaction violated a provision of the Constitution, a statute, or a regulation." *Piszel v. United States*, 121 Fed. Cl. 793, 801 (2015) (citation omitted), *aff'd*, 833 F.3d 1366 (Fed. Cir. 2016); *see Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572–73 (Fed. Cir. 1996). Exactions can be "direct" when money was paid directly to the Government or "in effect" when money "was paid to others at the direction of the government to meet a governmental obligation." *Aerolineas*, 77 F.3d at 1572–73. In the latter case, "the government has 'in its pocket' money corresponding to the payments that were the government's . . . obligation" to make. *Id.* at 1573; *Clapp v. United States*, 127 Ct. Cl. 505, 512 (1954) (describing illegal exaction as occurring when "the Government has the citizen's money in its pocket.").

Plaintiffs have not alleged that they paid money directly to the VA. Thus, to sufficiently plead an exaction in effect, they must state facts showing that the purchase of the fire alarm system from a third-party was made on the Government's behalf. *Piszel*, 121 Fed. Cl. at 801.[4] Two cases illustrate when the Government exacts money in effect. In *Aerolineas*, the Immigration and Naturalization Service ("INS") required two airlines to pay the housing and protection costs of alien asylum seekers who arrived in the United States on the airlines' planes without entry documents. 77 F.3d at 1568. There, a statute explicitly required INS to bear such costs. *Id.* at 1571–72. The Federal Circuit determined that an exaction in effect had occurred by the Government attempting to push these costs—which it was required by law to pay—on to the airlines. *Id.* at 1573–74. Alternatively, an exaction in effect may occur when a third-party obtains payment from the plaintiff on behalf of the Government and then remits that payment to the Government. For example, in *Camellia Apartments, Inc. v. United States*, 334 F.2d 667, 669 (Ct.

---

[4] A plaintiff may also plead an exaction in effect by alleging that the Government exacted its property, sold it, and received money from the sale. *See Piszel*, 121 Fed. Cl. at 801. Since Plaintiffs do not allege this circumstance, the Court need not address it here.

Cl. 1964), the Court of Claims determined it had jurisdiction over claims that the Federal Housing Administration ("FHA") had exacted money from three corporations owning apartment houses by requiring them, during a refinancing of their mortgages, to pay prepayment charges to private mortgagees who then remitted those charges to the FHA.[5]

A similar situation is not pled here. Though Plaintiffs have alleged that the $10,000 spent on the fire alarm system was the result of an unlawful condition imposed on Plaintiffs by the VA, nowhere does the Amended Complaint allege that Plaintiffs made payments to any third-party on the VA's behalf, either to cover an obligation of the VA or for remittal to the VA. *See Aerolineas*, 77 F.3d at 1573–74; *Camellia Apartments*, 334 F.2d at 669. Plaintiffs' contention that the VA obtained a better deal from the fire alarm system's installation is legally insufficient to invoke the Court's jurisdiction over an illegal exaction claim.[6] *Aerolineas*, 77 F.3d at 1573 (exaction occurs where money was "paid to others at the direction of the government to meet a *governmental* obligation." (emphasis added)); *see Piszel*, 121 Fed. Cl. at 801. According to the Amended Complaint, the alleged obligation under the Handbook to install the fire alarm system belonged to Plaintiffs, not the VA. ECF No. 57 ¶ 21; *see* ECF No. 67 at 5. Nor do Plaintiffs point to any source of law obligating the VA to bear the costs of WWHS installing the system.

Because the Amended Complaint does not contain facts demonstrating that any exaction,

---

[5] Plaintiffs cite *Camellia Apartments* to support their argument that jurisdiction is satisfied because the Government required a payment under a regulation or statute, regardless of to whom the payment was made. ECF No. 67 at 5–6 (citing *Camellia Apartments*, 334 F.2d at 669). In *Camellia Apartments*, however, the Court of Claims determined it had jurisdiction over the plaintiffs' claims precisely because the payments made by the plaintiffs to third-party mortgagees were remitted to the Government. *See* 334 F.2d at 669. Moreover, the language Plaintiffs quote was not about the court's jurisdiction over illegal exaction claims but rather its jurisdiction to hear actions founded upon Acts of Congress or Executive agency regulations. *See id.*

[6] Plaintiffs' contention is also inconsistent with the fact that the VA did not actually receive a "deal" because it ultimately did not award Plaintiffs a contract. *See* ECF No. 57 ¶ 37.

legal or illegal, direct or in effect, has occurred, the Court lacks jurisdiction to hear the claim.

        c.    *Constitutional Claims*

Nor can Plaintiffs demonstrate jurisdiction under § 1491(a)(1) based on claims that the VA violated Plaintiffs' rights to due process and equal protection.  Long-standing, binding precedent uniformly holds that the Fifth Amendment's Due Process and Equal Protection Clauses do not provide a basis for Tucker Act jurisdiction because they do not mandate payment of money by the Government.  *See Murray v. United States*, 817 F.2d 1580, 1583 (Fed. Cir. 1987); *Smith v. United States*, 709 F.3d 1114, 1116 (Fed. Cir. 2013) (citing *Leblanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995)); *Carruth v. United States*, 627 F.2d 1068, 1081 (Ct. Cl. 1980).

Relying on two cases, *Carey v. Piphus*, 435 U.S. 247 (1978), and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), Plaintiffs present the novel theory that "like illegal exactions . . . there is jurisdiction for two classes of 'money-mandating' constitutional claims: 1) facial provisions (such as 'just compensation' in a taking); and 2) as-applied provisions."  ECF No. 67 at 8.  The Court agrees with the Government that this argument is unpersuasive, especially considering the long line of consistent precedent to the contrary.  *See* ECF No. 73 at 5–6.

Indeed, the cases Plaintiffs cite are inapposite.  *Carey* held that "damages are available under [42 U.S.C. § 1983 (1996)] for actions 'found . . . to have been violative of . . . constitutional rights and to have caused compensable injury.'"  435 U.S. at 255 (emphasis omitted) (citation omitted).  That case, however, only answered the question of whether a plaintiff had to prove actual injury due to the deprivation of procedural due process rights to recover more than nominal damages under § 1983.  *Id.* at 248.  Since this Court lacks jurisdiction to adjudicate claims under § 1983, the relevance of *Carey* is unclear.  *See Blassingame v. United States*, 33 Fed. Cl. 504, 505

(1995), *aff'd*, 73 F.3d 379 (Fed. Cir. 1995), *reh'g denied*, *cert. denied*, 517 U.S. 1237 (1996). The same can be said for *Bivens*, which the Government correctly notes was decided in the context of a suit against government officials, not the United States itself. ECF No. 73 at 6. It is well established that this Court lacks jurisdiction to hear claims against individual government officials. *See Brown v. United States*, 105 F.3d 621, 624 (Fed. Cir. 1997).

In sum, each of Plaintiffs' § 1491(a)(1) claims—whether pled as an implied-in-fact contract, illegal exaction, or constitutional claim—fail for lack of jurisdiction and must be dismissed.

## B.     The Court Lacks Jurisdiction Over Count II to the Extent It Asserts an Independent APA Claim.

Count II of Plaintiffs' Amended Complaint alleges that the VA acted arbitrarily and capriciously in considering and denying Plaintiffs' proposal, failed to provide a reasoned explanation for its actions and decision, and acted contrary to the Fifth Amendment's right to equal protection by treating Plaintiffs in a discriminatory manner. ECF No. 57 ¶¶ 55–60. Plaintiffs seek monetary damages under the APA, as well as declaratory, injunctive, and mandatory relief. *Id.* ¶¶ 61–63. As the Government correctly argues, the APA does not provide a basis for jurisdiction in the Court of Federal Claims. ECF No. 68 at 8; *see Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003) (citing *Murphy v. United States*, 993 F.2d 871, 874 (Fed. Cir. 1993)); *Wopsock v. Natchees*, 454 F.3d 1327, 1333 (Fed. Cir. 2006) (noting "the APA does not authorize an award of money damages at all"). Thus, while § 1491(b)(4) directs the Court to apply the APA standard of review in bid protest cases under § 1491(b)(1), the APA cannot be the statutory basis for an independent claim. *Id.*

In any event, both parties agree that the allegations underlying Count II concern the VA's decision not to award Plaintiffs a contract under the Solicitation, and thus may elaborate on or

provide substantive grounds for their remaining § 1491(b)(1) claim.  ECF No. 68 at 8; ECF No. 67 at 11.  Consequently, while Plaintiffs may assert such allegations in connection with their bid protest claim, Count II is dismissed to the extent it asserts a standalone APA claim.

### C.    The Court Lacks Jurisdiction Over Count III's CDA Claims.

In Count III, Plaintiffs allege that the Court has jurisdiction under the CDA over their breach of implied-in-fact contract claim.[7]  ECF No. 57 ¶¶ 65–71; ECF No. 67 at 11–15.  Although the Government does not dispute that the CDA applies to such claim, it contends Plaintiffs have not pled facts demonstrating the CDA's jurisdictional prerequisites.[8]  ECF No. 68 at 9–10; ECF No. 73 at 6–9.

The Tucker Act grants the Court of Federal Claims jurisdiction "to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of [the Contract Disputes Act]."  28 U.S.C. § 1491(a)(2); *see* 41 U.S.C. § 7104(b)(1) (providing for judicial review in the Court of Federal Claims of the decision of a contracting officer under §

---

[7] Plaintiffs' CDA claim appears to be founded on the same implied-in-fact contract claim raised under § 1491(a)(1).  As discussed above, Plaintiffs have not pled all elements of a valid implied-in-fact contract, in which case the CDA does not apply.  *See* 41 U.S.C. § 602(a) (2008) (limiting the CDA to express or implied contracts made by an Executive agency).

[8] Neither party tries to justify the contention that the CDA applies to Plaintiffs' breach of implied-in-fact contract claim.  The Court is not entirely satisfied that the alleged representation by the VA that WWHS "would move forward with the solicitation" if it installed a fire alarm system qualifies as a procurement contract subject to the CDA, especially where the claim arises in the context of a procurement solicitation that was not awarded to the plaintiff.  ECF No. 67 at 4.  The CDA "does not cover all government contracts." *Coastal Corp.*, 713 F.2d at 730 (rejecting the argument that the CDA applies to "other contracts tangentially connected with government procurement of goods and services"); *see Lublin Corp. v. United States*, 84 Fed. Cl. 678, 682 (2008) (holding that the Government's agreement to keep feedback provided by a subcontractor confidential during a quality review of the prime contractor was not a "procurement" where the Government did not acquire a service from the subcontractor for its direct benefit).  In any event, because the Court agrees that Plaintiffs have not met the CDA prerequisites, it need not address the threshold applicability argument.

7103).  The Court's jurisdiction is conditioned on a plaintiff satisfying two prerequisites.  First, a plaintiff must show that it submitted to the contracting officer a written demand containing "adequate notice of the basis and amount of the claim and . . . a request for a final decision."  *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1328 (Fed. Cir. 2010); 41 U.S.C. § 7103(a)(1)-(2).  Second, it must show that the contracting officer issued a final decision on the claim or that the contracting officer did not issue a decision within the statutory timeframe, in which case the claim is deemed denied.  *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1543 (Fed. Cir. 1996); 41 U.S.C. § 7103(a)(3), (f)(5).  If a plaintiff fails to meet both prerequisites, its CDA claim must fail.  *See Northrop Grumman Computing Sys., Inc. v. United States*, 709 F.3d 1107, 1112 (Fed. Cir. 2013) ("If a purported claim is found to be insufficient for any reason, the insufficiency is fatal to jurisdiction under the CDA." (citation omitted)).

Although the statute does not define "claim," the Federal Circuit has identified three requirements for a valid CDA claim: "(1) the contractor must submit the demand in writing to the contracting officer, (2) the contractor must submit the demand as a matter of right, and (3) the demand must include a sum certain."  *H.L. Smith, Inc. v. Dalton*, 49 F.3d 1563, 1565 (Fed. Cir. 1995) (interpreting the definition of "claim" in 48 C.F.R. § 33.201 (2014)).  To constitute a written demand, "a claim must be 'for something due or believed to be due' and must 'provide the contracting officer with notice of the relief requested and the legal and factual basis for that request.'"  *Estes Express Lines v. United States*, 123 Fed. Cl. 538, 545 (2015) (citation omitted); *Fed. Contracting, Inc. v. United States*, 128 Fed. Cl. 788, 797 (2016) (holding that a demand is at least an "authoritative or formal type of request").  To submit the demand as a matter of right, a contractor must "specifically assert entitlement to the relief sought."  *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1265 (Fed. Cir. 1999) (citations omitted).  A demand meets the sum

certain requirement where it contains "a clear and unequivocal statement of the amount of the claim." *CPS Mech. Contractors, Inc. v. United States*, 59 Fed. Cl. 760, 764 (2004) (emphasis omitted) (citing *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987)).

Plaintiffs argue that the Amended Complaint demonstrates the CDA prerequisites, as evidenced by the allegations detailing Plaintiffs' communications with various VA officials beginning on August 8, 2018 and culminating in the NCO 8 Division Chief's September 11, 2018 email.  ECF No. 67 at 14; ECF No. 57 ¶¶ 37–45.  As an initial matter, the Amended Complaint does not include copies of any alleged written correspondence, and thus the Court can rely only on Plaintiffs' characterizations and paraphrasing of the communications.  Based on those allegations, Plaintiffs' interactions with the VA, beginning with the email to Mr. Cassidy on August 8, are described largely as an "inquiry" into why WWHS's proposal was rejected and an effort to show that the grounds stated in the denial letter were inaccurate.  *See, e.g.*, ECF No. 57 ¶¶ 37–38, 41–43.

Plaintiffs rely specifically on the list of questions Ms. Nicolas sent to the NCO 8 Deputy Director as demonstrating that they submitted a valid CDA claim.  *See* ECF No. 57 ¶ 44; ECF No. 67 at 14–15.  The alleged questions are as follows:

1. Requesting VHA Handbook 1147

2. Requesting Fair Opportunity in Solicitation VA248-17-R-0713 without bias, without discrimination, and without prejudice.

3. What measures are being taken so to ensure that a fair opportunity will be provided?

4. What is the current status where my facility currently is in this Solicitation process and based on what facts?

5. VA required me to put in a fire alarm system in a building I do not own as a

> requirement when no clarity was provided, a $10,000.00 system has been placed, my hard earned money has been spent to meet what is said to be a requirement and received email from VA that I have passed the requirements and now no one is returning my call.  How is this considered fair and how are this putting Veterans first when VA has stated there's a need for the services that my facility provides?

ECF No. 57 ¶ 44.  Consistent with prior communications, however, these "questions" do not meet the CDA claim requirements.  *See id.*  First, rather than constituting an "authoritative or formal type of request," *Fed. Contracting*, 128 Fed. Cl. at 797, the questions are, for the most part, merely inquiries directed at the legitimacy of the solicitation process, *see* ECF No. 57 ¶ 44.  The questions appear to include two requests—one for an official copy of the Handbook, *id.* ¶ 44(1), and the other for a fair opportunity to bid for the Solicitation "without bias, without discrimination, and without prejudice," *id.* ¶ 44(2).  These requests, however, do not relate to Plaintiffs' CDA contract claim (but rather their bid protest claim), do not request the relief sought in this action under the CDA, or state a sum certain—*i.e.*, the $10,000 cost incurred by Plaintiffs to install the fire alarm system.  *K-Con Bldg. Sys.*, 778 F.3d at 1005 (discussing importance of claim identification in determining CDA jurisdiction).

Even question five, with its assertion that Plaintiffs spent $10,000 to install the fire alarm system, does not clearly assert an "entitlement as a matter of right."  ECF No. 57 ¶ 44(5); *Alliant Techsystems*, 178 F.3d at 1265.  Indeed, the demand made in question five was for the VA to explain whether it considered Plaintiffs' circumstances "fair" or appropriately aimed at "putting Veterans first."  ECF No. 57 ¶ 44(5); *see id.* ¶ 37 (describing similar expression of "frustration" in August 8 email to Mr. Cassidy).  The question does not demonstrate entitlement to damages for installation costs, let alone authoritatively request them.  Moreover, none of the questions contain a request for a final decision of the contracting officer, as required even under the lax standard cited in Plaintiffs' Opposition.  *See* ECF No. 67 at 12 ("[T]he requirement of submission of the

claim to the contracting officer for final decision 'does not require an explicit request for a final decision; as long as what the contractor desires by its submissions is a final decision.'" (quoting *James M. Ellet Constr.*, 93 F.3d at 1543)); *see M. Maropakis Carpentry*, 609 F.3d at 1328.

Plaintiffs argue that the Division Chief's September 11 response to Ms. Nicolas demonstrates that the VA understood her inquires to be a contested claim under the CDA.   ECF No. 67 at 15; *see* ECF No. 57 ¶ 45(e).   In that response, the Division Chief allegedly instructed Plaintiffs that any remedy to resolve their concern with the "direction given to members of your firm" in relation to the Solicitation "must be addressed in accordance with FAR Part 33 procedures, as applicable, or through other legal remedies that may be available to your firm."[9] ECF No. 57 ¶ 45(e).   But Plaintiffs' argument is a leap unsupported by a fair reading of the pleadings.   As Plaintiffs acknowledge, FAR Part 33 covers both protests and contract disputes, and "prescribes policies and procedures for filing protests and for processing contract disputes and appeals" at the administrative level.   FAR § 33.000 (1985).   Given the broad reference to FAR Part 33, it is difficult to infer what the Division Chief understood Plaintiffs' list of questions to be.   As the Government notes, such reference could just as easily be interpreted as suggesting that the Division Chief did not believe Plaintiffs had initiated the necessary administrative procedures to assert a CDA claim and thus directed Plaintiffs to FAR Part 33 if they desired to do so in the future.   ECF No. 73 at 9.

Finally, Plaintiffs have not properly pled that they submitted a valid CDA claim to Ms. Rodriguez, the contracting officer.   "Congress deliberately left the language concerning submission to the contracting officer 'broad . . . to permit appropriate Government officers to

---

[9] Plaintiffs erroneously refer to the Division Chief as the contracting officer in their Opposition.   *Compare* ECF No. 67 at 15, *with* ECF No. 57 ¶ 39.

receive written claims and forward them to the [contracting officer].'" *Dawco Constr. v. United States*, 930 F.2d 872, 880 (Fed. Cir. 1991), *overturned in part on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995). But although the CDA "does not . . . require that the claims be sent only to the contracting officer, or necessarily directly to that officer," *Neal & Co. v. United States*, 945 F.2d 385, 388 (Fed. Cir. 1991), Plaintiffs must nonetheless demonstrate that the dispute was ultimately submitted to Ms. Rodriguez for final decision, *Dawco*, 930 F.2d at 880.

Plaintiffs' Amended Complaint lacks sufficient factual allegations to make this conclusion. The list of questions on which Plaintiffs principally rely was requested by and submitted to the Deputy Director, and then responded to by the Division Chief. ECF No. 57 ¶¶ 44–45. The Amended Complaint contains no evidence or allegations that Ms. Rodriguez received Plaintiffs' list of questions or took any action on them, or that she had any involvement with the September 11 response to those questions. *Id.* Similar allegations are absent with respect to the alleged communications directly between Ms. Nicolas and Ms. Rodriguez. *Id.* ¶¶ 38–39. And because the Amended Complaint does not allege that a claim was submitted to Ms. Rodriguez for final decision, it likewise does not allege that Ms. Rodriquez, as contracting officer, issued a final decision reviewable by this Court. At most, Plaintiffs point to the Division Chief's September 11 email as evidence of a final decision, but the Division Chief was not the contracting officer.

These deficiencies are fatal, and as such, Plaintiffs' CDA claim is dismissed.

**D.    Ms. Nicolas Does Not Have Standing to Pursue the Remaining § 1491(b)(1) Claim.**

With all but the § 1491(b)(1) claim dismissed, the Court must address whether Ms. Nicolas has standing to pursue such claim going forward. The Government contends that because WWHS submitted the bid in this case, WWHS—and not Ms. Nicolas—is the only interested party in this action. ECF No. 68 at 10. Plaintiffs argue, without any further explanation, that Ms. Nicolas has

third-party standing to pursue the § 1491(b)(1) claim because, as sole owner, she has "a close relationship" with WWHS, has "suffered an injury in fact," and "there is some hinderance to the first party filing its own claim." ECF No. 67 at 16 (citing *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991)). The Government's argument is the correct one.

Axiomatic to bid protest jurisprudence is the notion that only an "interested party" has standing to challenge contract awards under § 1491(b)(1). *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citation omitted). The issue of standing in bid protest cases is controlled by the jurisdiction-granting language of § 1491(b)(1) itself, which "imposes more stringent standing requirements than Article III." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009). While the statute does not define "interested party," the Federal Circuit has held that "the parties encompassed by that term are limited to '*actual or prospective bidders* or offerors'" who possess a "*direct economic interest* [that] would be affected by the award of the contract or by failure to award the contract."[10] *Rex Serv. Corp.*, 448 F.3d at 1307 (emphasis in original) (citing *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)).

WWHS's standing is undisputed. *See e.g.*, ECF No. 68 at 1. Ms. Nicolas, as owner and President of WWHS, submitted a bid under the Solicitation through and on behalf of WWHS, and thus WWHS is the actual bidder. ECF No. 57 ¶ 12; *see id.* ¶¶ 14, 24, 30, 37 (references to WWHS as bidder); *CGI Fed., Inc. v. United States*, 779 F.3d 1346, 1348 (Fed. Cir. 2015). Similarly, the Government does not dispute that WWHS—as an actual, disappointed bidder—had a direct economic interest in the outcome of the Solicitation award. *Weeks Marine*, 575 F.3d at 1359.

---

[10] Plaintiffs have not explained how the concept of third-party standing can be reconciled with the standing requirements of § 1491(b)(1), nor have they cited any case law in which such standing principles were applied to a bid protest claim.

Whether the owner of a business soliciting a government contract is an interested party under § 1491(b)(1) has not been thoroughly fleshed out. In several cases, however, other judges of the court have drawn a distinction between sole proprietors, who have been found to have standing, and sole owners of limited liability entities, like Ms. Nicolas, who have not. *Compare Sims v. United States*, 112 Fed. Cl. 808, 815–16 (2013) (holding sole proprietor had standing to bring a § 1491(b) action in her own name), *with Innovation Dev. Enters. of Am., Inc. v. United States*, No. 11-217 C, 2012 WL 251985, at *4 (Fed. Cl. Jan. 11, 2012) (denying standing to the sole owner of a corporation where the corporation was the business entity that could have bid on the contract, not the sole owner). The reason for drawing this distinction here is simple: WWHS, as a limited liability company, is a legal entity distinct from Ms. Nicolas. Fla. Stat. § 605.0108 (2013); *see* ECF No. 57 ¶¶ 4–5.

Consequently, only WWHS has sufficiently pled standing in this matter, and thus, only WWHS's § 1491(b)(1) claim can move forward.

## IV. CONCLUSION

For these reasons, the Government's Motion to Dismiss in Part (ECF No. 60) is **GRANTED**. All claims in Counts I and II—except for WWHS's § 1491(b)(1) bid protest claim—as well as Count III are **DISMISSED** for lack of subject matter jurisdiction. Additionally, Ms. Nicolas is **DISMISSED** for lack of standing.

**SO ORDERED**.

Dated: September 1, 2021

*/s/ Kathryn C. Davis*
KATHRYN C. DAVIS
Judge